UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
ABIDALI HAJI,

                    Petitioner,

          -against-

DAVID MILLER, Superintendent, Eastern
   Correctional Facility,

                    Respondent.
-----------------------------------------------------X

**MEMORANDUM & ORDER**

**05 CV 2490**

DEARIE, Chief Judge.

       Petitioner Abidali Haji and his co-defendant Rashid Khan seek a writ of habeas corpus

under 28 U.S.C. § 2254, claiming that they committed the crime of conspiracy in the second

degree under New York law only once, but were convicted and punished for having done so

twice, and that this action of the state, although it was accomplished in only a single proceeding

rather than successive trials, nonetheless violates their protections under the Double Jeopardy

Clause of the Fifth Amendment as applied to the states under the Fourteenth Amendment.[1]  This

Court agrees.


**FACTUAL BACKGROUND**

       The pivotal event in the indictment and the Double Jeopardy analysis here is an

undercover heroin buy, arranged by a confidential informant ("CI"), that took place on January

---

[1] Khan filed a separate petition, also pending before this Court, raising the same Double
Jeopardy issue.  *Khan v. Fischer*, *06-CV-2717*.  The separate order that shall issue in that case
incorporates by reference the discussion here.

2, 1997.  In an encounter lasting fewer than ten minutes, the CI introduced Khan and petitioner to an undercover officer, the drug buy occurred and, according to the indictment and respondent's unqualified position here, one conspiracy ended and a second began.   Respondent argues specifically that the objective of the first conspiracy was solely to consummate that initial sale to the undercover on January 2, and that the objective of the second, distinct conspiracy was to seek to obtain additional heroin from Pakistan to continue to supply the undercover.

**A. Trial Evidence**

1. The January 2, 1997 Transaction

Surveillance on that day, according to the trial testimony, began shortly before the transaction, when petitioner and Khan were observed leaving a home in Astoria, entering a white Chevrolet Impala, and driving off.  T. 1457-58.  Petitioner was carrying a white bag while Khan carried two white coffee cups.  T. 1458.  Surveillance resumed several minutes later by Detective Ward in the parking lot behind a Pathmark Supermarket on Atlantic Avenue.  T. 852-65.

The white Impala, with Khan driving and petitioner in the front passenger seat, entered the lot and parked; the undercover and the CI were seated in a BMW parked approximately 25 feet away.  Khan exited the Impala while the CI and the undercover left the BMW.  All three greeted each other and then entered the BMW, Khan in the front passenger seat, the CI behind him in the rear seat, and the undercover in the driver's side rear seat, beside the CI.

Once inside the BMW, Khan and the undercover engaged in brief negotiations about the price and quantity of the drugs to be sold, matters substantially pre-arranged by the CI.  T. 1092-

93; 1175.[2]  They agreed upon a price of $7,000 for 70 grams.  T. 1093.  Khan then asked to see

the money and count it, so the undercover reached under his seat for a white paper bag, showed

it to Khan, and together they counted the money.  Khan returned the money to the bag and

placed it in his coat pocket.  T. 1094.  He then exited the BMW, went over to the Impala, quickly

returned carrying a white coffee cup, and re-entered the BMW.[3]  T. 1094.  Khan handed the cup

to the undercover, who removed from it a small plastic bag containing heroin.  T. 1095.  The

undercover examined the bag, and then, as pre-arranged with the CI,[4] began to discuss with Khan

his interest in purchasing additional heroin from Khan in the future. The undercover told Khan

that he was already involved in an arrangement with another supplier, but that if he liked Khan's

product he would deal with him instead.  T. 1155.  Khan supplied the undercover with his pager

number on the bottom of the white coffee cup. 1096-97.

Khan left the BMW with the CI and the undercover and all three approached the Impala,

with Khan carrying the bag of money.  T. 864.  Petitioner, who had been in the Impala

throughout the transaction, facing away from the BMW, then exited the car and embraced the

undercover.  Khan and petitioner then re-entered the Impala and drove off.

Surveillance resumed shortly thereafter when another officer observed petitioner and

Khan at a red light approximately three or four miles from the Pathmark.  T. 1459.  The officer,

---

[2]  The tape of course recorded only what was visible through the BMW's front
windshield, above the level of the dashboard, but the undercover offered testimony about the
conversations and actions occurring inside the BMW.

[3]  Khan's exit from the BMW, his walk toward the Impala, and his return to the BMW
with a white cup were all plainly visible on the videotape.

[4]  The undercover testified that, in setting up the January 2nd buy, the CI and he "were
supposed to make arrangements to have future meetings if everything had gone well."  T.  1192.

looking down from his truck through the Impala's passenger window, saw petitioner counting a large stack of money. T. 1460.

2. The Post-January 2, 1997 Recorded Conversations

The prosecution offered recordings of several consensual conversations and related testimony that establish the efforts of Khan and petitioner, following the January 2 sale, to obtain additional heroin to sell to the undercover.[5]  The first recorded conversation occurred on January 10, 1997 when Khan met with the CI and the pair discussed another heroin buy.  T. 870-76.  Detective Ward, who observed the meeting, offered commentary on the conversation: "The previous date, January 2nd, the undercover purchased heroin from [Khan] and in this conversation on 1/10, we're trying to renegotiate another deal to take place in the future, and so the confidential informant discussed with [Khan], listen, it was good, he want [sic] some more good shit."  T. 956.

The next three recorded conversations occurred on March 7, March 26, and April 4, 1997.  Each was a telephone call from petitioner to the undercover, responding to a message left by the undercover on Khan's pager (the number Khan had furnished on the bottom of the coffee cup in the BMW).  T. 1135, 1138, 1145-47, 1155, 1162-64.  Khan was by then in Pakistan, having departed on March 5.  T. 962-65.  In none of these calls was there explicit mention of drugs, but as to each, the undercover testified that the code, shorthand and euphemisms used in the conversation were his way of asking for more heroin from Khan; he understood petitioner's response to be that Khan did not have any heroin but was working to obtain some, that he would have it shortly, and that it would be of the same quality as what was sold on January 2.  T. 1145-

_____

[5] The Court was not furnished with the recordings themselves but relies here on the descriptions of the recordings contained in the trial testimony.

48, 1153-55.  The undercover reminded petitioner of the portion of his (the undercover's) conversation with Khan back on January 2 during which he had told Khan about his existing relationship with a supplier and his willingness to switch if he liked what Khan supplied. T. 1155.

The prosecution wiretapped petitioner's telephone and offered at trial the recordings of several conversations between petitioner and individuals in Pakistan.  Drugs were not referred to explicitly, but in the call on April 29, 1997, "Gunny" told petitioner that Khan was arrested in Pakistan, that "everything had been confiscated" and that "if you have more than 11 grams you get the death penalty."  T. 1298.   Recorded calls on April 29, April 30, and May 1, 1997 revealed petitioner's continued concern that he had no money, and chronicled efforts then underway in Pakistan to secure Khan's release.  T. 1308-15; 1319-35; 1371-75.[6]  On May 15, 1997, petitioner spoke with Khan, apparently just released by Pakistani authorities; the conversation was mostly about petitioner's financial distress.  T. 1378-84.

3.  The "Narcotics Records"

Executing a search warrant on July 16, 1997, police seized a briefcase containing two sheets of paper with columns of handwritten numbers and dates.  Detective Ward, whom the court qualified as an expert based on his fourteen years experience as a narcotics investigator, testified that in his opinion the sheets were narcotics records.  T. 999.  Ward pointed to an entry of "zero one zero two with 7,000 next to it," which he believed reflected the receipt of $7,000 for the sale of heroin on January 2.  T. 1015.  On the basis of that example, Ward opined that other similarly made numerical entries on the same page also reflected denominations of United States

---

[6]  On these three calls, petitioner spoke again with "Gunny" and also with an individual referred to as petitioner's sister-in-law "Gul."

currency "relat[ing] to trafficking in heroin that took place during the course of [his] investigation." T. 1016, 1032-33. Ward agreed that the second of the two sheets, which reflected the apparent payment of utility and credit card bills, were not drug records. T.1031. At the close of the case, the prosecution argued that these records corresponded "precisely and exactly" to the sale on January 2, and to at least five earlier sales, occurring in November and December of 1996. T. 1596. The prosecution also argued that the records were evidence of "the ongoing heroin trafficking business" T. 1597.[7]

## B. The Indictment

### 1. The Language and Theory of Two Conspiracies

Both the "First Count" and "Second Count" of the indictment charged petitioner and Khan with conspiracy in the second degree in violation of New York Penal Law § 105.15. Both also charged that the offense was committed by acting "with the intent that conduct constituting an 'A' felony be performed: to wit, the crime of criminal sale of a controlled substance in the first degree." Finally, both counts alleged, in identical language, that the "objectives of the conspiracy were to profit through the sale of in excess of two ounces of heroin to a person known to the grand jury," and that "[t]he conspiracy was accomplished through various means including the obtaining of heroin from other sources unknown to the grand jury."

The only difference in the general charging of means and objectives was the inclusion in the Second Count, but not the First, of an allegation about the participants' relative roles:

---

[7] Both Khan and petitioner were arrested on July 16, 1997, placed in a line-up and identified by the undercover. T. 1164. Police recovered a glassine of heroin from petitioner's shirt pocket and a scale from his apartment. T. 1018, 1464. Ward testified that the scale was of the type used to measure grams. T. 1023.

namely, that "Khan was responsible for obtaining the heroin from a source in Pakistan" and that petitioner "was responsible for maintaining contact with customer in the United States while Khan was in Pakistan."

The two counts also differ with respect to the alleged start and end dates of the two conspiracies. The first conspiracy is alleged to have happened entirely "on or about January 2, 1997," while the second conspiracy occurred "on or about and between January 2, 1997 and July 16, 1997." With the flexibility inherent in "on or about" allegations, this charging language, on its face, suggests possibly overlapping conspiracies. When turning to the overt acts, however, it becomes clear—as respondent has made even more clear in its arguments here—that the prosecution pursued a theory of successive, wholly discrete conspiracies that, despite having common participants and similar objectives, fall on opposite sides of a what is at most a moment in time.

Specifically, the indictment alleges two overt acts for the first conspiracy: that petitioner and Khan traveled to the Pathmark parking lot on January 2, and that they then made a sale of heroin to the undercover. The *second* conspiracy's *first* alleged overt act is that "Khan gave his pager number to a person known to the grand jury on a paper cup." As the trial testimony established, this happened at the same time as, or only a moment after, the heroin sale. Respondent does not equivocate here: its unqualified contention is that the first conspiracy terminated with the sale and that a second, distinct one was born in virtually the same instant.

With one exception, the Second Count's additional overt acts are consistent with the temporal and geographic components of respondent's theory inasmuch as they are mostly

Pakistan-related and occur *after* the January 2 sale.[8]  The exception, however, is the final overt

act, the possession of papers alleged to be narcotics records.  If Ward's opinion testimony is to

be credited and they are indeed records of drug transactions, as the prosecution argued at trial

and contends here, the transactions they relate to include the January 2 sale and other possible

*earlier* sales—all falling on the "First Count" side of the line prosecutors drew in this particular

conspiratorial sand—but not what the prosecution claims are the activities or distinct objective of

the second conspiracy.

2.  The Pre-trial "Editing" of the Indictment

The indictment as handed down by the Grand Jury of Queens County underwent

unorthodox editing in the final days before trial that, while not altering the line between the two

conspiracy counts, did significantly affect what the prosecution now defends as the overall

contours of the two purportedly distinct conspiracies.

The principal revision was the striking of three overt acts occurring two weeks before the

January 2 sale, on December 17, 1996, that the indictment originally charged as part of the First

Conspiracy.  These acts included a meeting with the CI and a sale of a "sample (1.2) grams of

heroin to a person known to the grand jury."  Approximately ten days before trial, the

prosecution moved to withdraw these three allegations, advising the trial court that, due to the

death of the CI, the acts could not be proven.  The court granted the application without

objection, and the indictment bears the trial court's initialed redaction. T. 36-37.[9]

_____

[8] The overt acts include the several recorded telephone conversations, Khan's travel to Pakistan, Khan's possession of heroin in Pakistan, and petitioner's possession of drug paraphernalia.

[9] The court likewise granted the application to dismiss the substantive sales and possession counts that corresponded to these overt acts.  T. 37.

This feature of the indictment's history, while showing that the first conspiracy as originally conceived was broader in scope than the count that was tried, serves to render the line between the two conspiracies *more* rather than *less* tenuous, inasmuch as it indicates (like the narcotics records) a sustained course of ongoing activity rather than any material distinction between the conduct occurring before and immediately after the January 2 sale.

Second, having withdrawn the December 17 overt acts, the prosecution apparently then believed it would also have to revise the first conspiracy's start date because it, too, was December 17. The jury had already been sworn and openings were about to begin when the prosecution noticed that the start date for the First Count "seems now to be in conflict" with the overt-act section. T. 741. "Unfortunately," the prosecution told the court, "now that the earliest date had been stricken, due to the informant's demise, now we're left with something that doesn't equate." T. 741. It is not certain that this additional step was needed, as long as the conspiracy to be proven would fall within the larger period originally alleged, but the solution that the prosecution proposed was to change the *end*-date, January 2, rather than the start date – which was the more obvious remedy called for by the striking of earlier-occurring overt acts – and to revise that date by extending it *forward*, to the date of petitioner's and Khan's arrest, July 16, 1997. T. 742. The court acknowledged that it could "give some latitude and flexibility in consideration of the language 'on or about and between,'" but concluded that the prosecution was "seeking to develop evidence over and above and beyond the timeframe that they pled originally" and that "January to July far exceeds . . . [the] flexibility that [it] could lawfully contemplate." T. 743. Citing the exigency of a sworn jury waiting to be brought in, the court guided the parties, if in compromise, to the version of the First Count on which the case went to

trial.  T.  744.[10]

Finally, given this body of drafting misfires, perhaps it should not be surprising that still

further cleaning-up occurred at the close of the evidence, as the court reviewed the indictment a

final time before reading it to the jury as part of its charge.  It appears that only then did all

parties and the court close the editing loop begun pre-trial with respect to the start and end-dates

of the Count One conspiracy.  The trial court announced,

> under the first count of the indictment that . . . I have to charge, using this
> language the Court has reviewed the overt acts alleged under count 1, overt act
> number 6 refers to quote, on or about July 16, 1997 in the County of Queens,
> [Khan] possessed narcotics records.  That refers to July 16, 1997 and we have a
> limitation and that is up to January 2nd, 1997, so that falls beyond it and I'm
> going to strike overt act number 6 because it is beyond January 2nd.

T. 1522.

The court was of course correct, inasmuch as it was the court's own ruling during the

pre-trial "editing" session that declared January 2, 1997 to be the termination of the first

conspiracy, but neither the court nor any of the parties remarked, at the time of this striking of

---

[10]  Still further drafting errors were caught and corrected in the final pre-trial moments,
prompting the trial court to remark, "I'm wondering why it took three and half years for this to
be noticed," T. 37, sentiments this Court shares.  Among other things, the court granted the
prosecution's unopposed request to dismiss the original count 5 and count 6, which had charged
criminal sale of a controlled substance in the third degree and criminal possession of a controlled
substance in the third degree, on the grounds that they were the lesser included offenses of two
other counts in the indictment.  T. 736-37.  The prosecution also moved to "correct" the Tenth
Count, which charged petitioner with criminal possession of a controlled substance in the
*seventh* degree, but was, the prosecution maintained, intended to charge possession in the *third*
degree. This change was not mere semantics, as seventh degree is  only a misdemeanor, while
third is a felony.  Noting that the penal provision cited in the count was in fact the third and not
the seventh degree statute, the court concluded that the error was one of form rather than
substance and granted the application, but again expressed its discomfort with the prosecution's
apparent lack of attentiveness, remarking, "I don't think the prosecution should take any pride in
having something like this continue on for three and a half years without someone paying
attention to it."  T. 739

overt act 6 from Count One, upon the full reverberations of that gesture: among other things, the identical overt act was also charged as part of the second conspiracy; petitioner had challenged, in a pre-trial motion (discussed below), the duplicate charging of this overt act in both conspiracy counts as part of a claim that he was being charged twice for the same crime; was challenged in an earlier pre-trial motion (discussed below); and this was the overt act referenced by the prosecution during the pre-trial "editing" session when it proposed extending the end-date of count one to July 16.[11]

## C.  The Prosecution's Theory at Trial

### 1.  Opening and Summation

Despite casting the criminal conduct as two distinct conspiracies in the indictment, the prosecution did not try, or argue, the theory of distinctness.  Instead, the prosecution introduced its case to the jury by arguing that the January 2nd sale was an "act [that] was just *one part of the ongoing conspiracy* to import heroin from Pakistan and distribute it here in Queens,"  T. 777 (emphasis added), and cast many of the acts recited in the Second Count of the indictment as a continuation of acts committed as part of the First Count, referring, for example, to "*additional* heroin from Pakistan to sell *again* to the undercover," T. 778 (emphasis added),  and asserting that, "these courses of action, the sale of the heroin, the phone calls, the meetings, the trip to Pakistan, these acts show an *ongoing effort by both defendants to keep their heroin business*

_____

[11]Seeking to justify its request to extend the First Count forward from January 2 to July 16, the prosecution not only noted that July 16 was the date of arrest, but also stated: "If you look at the portion of count 1, it also includes that on July 16 of 1997 the defendant Khan was in possession of narcotic records, so the date upon that we're talking about is outlined in the first count."  T. 741.

*going.*" T. 794 (emphases added).

"Ongoing" was also the refrain to which the prosecution returned during summation, when it described the activities of petitioner and Khan as an "ongoing narcotics business," T. 1591, and referred twice more to "the ongoing conspiracy to distribute narcotics," T. 1594, and "the ongoing heroin trafficking business these men engaged in." T. 1597. The prosecution also plainly implied to the jury that the heroin Khan sought to obtain in Pakistan was not different from, but rather more of, the kind he sold on January 2: "They . . . apparently sold their inventory," and Khan went to Pakistan "looking for an opportunity *to reup*, *to get more inventory* so they could sell it on the street." T. 1592.

Even when focusing the jury's attention specifically on the January 2nd sale, during which one conspiracy supposedly ended and the other began, the prosecution glossed over the alleged succession of conspiracies, resorting to generalized statements that employ the singular and the plural indiscriminately. Specifically, the summation refers to two *counts*, but not two conspiracies, without addressing how they might differ: "Now, the January 2nd things that I just talked about . . . start to go into the issue of the first and second counts of the indictment." T. 1590. But the argument quickly returned to the notion of a single conspiracy: "[s]o, for the conspiracy, you have the sale of the 2nd. You have the ongoing conversations between customers . . .You have the attempt [Khan] had in obtaining heroin from Pakistan and [petitioner] covering him." T. 1593-94.[12] Indeed, it is not impermissible speculation to assume

---

[12] The prosecutor's use of the word customers in the plural is apparently a reference to an individual named "Gee," who was allegedly a prospective heroin customer in New York. The prosecutor's opening described Gee to the jury as "another buyer of heroin." T. 792. Late in the trial, the prosecutor described Gee to the court as "another individual just as [the] undercover was, who was waiting for and trying to purchase heroin from the defendants." T. 1255. The court noted that there was "only brief mention of Gee in the testimony," T. 1251, and the

that, when preparing urge the jury to vote in their favor, prosecutors undertook the most basic preparatory step of matching the counts of the indictment to their inventory of the evidence and discovered the cavernous gap separating the two.  Little else can explain the prosecution's failure to clarify for the jury the distinction between the two counts, or the verbal stumble at this critical point in the summation.

2.  Opposing the Defense Sufficiency Challenges

Finally, when petitioner and Khan moved at the close of the evidence to dismiss the conspiracy counts for insufficient evidence, the prosecution's defense of its case drew no distinction between the conspiracies, but instead argued that, "It's the people's theory that both defendants maintain *an* ongoing narcotics trafficking *organization or conspiracy* that *include[s] the dates, including through July 16,* and that *this organization* existed for the purpose of distributing heroin in Queens County, when and if the organization had . . . heroin to distribute." T.  1512 (emphasis added).   This remark (i) equates the conspiracy (in the singular) with the heroin-distributing organization, (ii) makes no distinction between the heroin actually distributed before January 2 and the heroin intended to be distributed after that date ("when and if the organization had heroin to distribute"), and (iii) makes no geographic distinction (". . . for the purpose of distributing heroin in Queens County").

As the prosecution continued, its remarks also drew no distinction in kind between the sale of heroin on January 2 (which is in conspiracy one, according to the indictment), and the small amount of heroin found in petitioner's possession at the time of his arrest (an amount the

---

prosecutor made no mention of Gee at all in the closing.  It is apparent, then, that Gee played no real role and in any event, even if she was an active second customer, that fact alone would not substantiate the charging of a second distinct conspiracy.

petitioner argued was too small to be for sale and was instead for personal use):

> There was an amount of heroin that was in the possession of a member of this conspiracy, and therefore, it's our position *it was up for sale as much as any other piece of heroin in their inventory might be.* The fact it was *a small white as opposed to the considerably large white sold on January 2nd* is I'm [sic], as the counts don't have a weight requirement.

> It's our opinion that under the totality of the circumstances, given the evidence, as to that would establish [sic] regarding the activities of this organization through the period encompassed by the conspiracy counts. That, essentially, *any piece of heroin in the inventory would be subject for sale and it was their intent to do so.*

T. 1512-13 (emphases added). (To be clear: the "small white" refers to the small amount of heroin found in petitioner's possession on the last day of the second conspiracy, and the "large white sold on January 2nd" refers to the sale that supposedly occurred during the first conspiracy.)

Likewise, when opposing the sufficiency challenge to petitioner's particular involvement, the prosecution again recited "other things that connect him *to the overall ongoing nature of the relationship.*" T. 1519 (emphasis added).

3.  The Money Laundering Count

Count twelve of the indictment charged petitioner and Khan with a money laundering scheme in connection with the proceeds of illegal drug sales. Notably, the count alleges that the illegal financial activity occurred during the period beginning on or about December 17, 1996 – which is the original, pre-"edited" start date of the first drug conspiracy – through in or about July 16, 1997, the end date of the second drug conspiracy. The trial court dismissed the count, however, finding insufficient evidence of the jurisdictionally required ten thousand dollar transaction. T. 1521**.**

D.  **The Jury Charge**

The defense did not request, and the court did not deliver, a specific instruction to the jury on the issue of whether the proof established the existence of one or multiple conspiracies.[13]

Perhaps the most significant portion of the charge was the trial court's rather revealing use of the word "also" when describing the objectives of each conspiracy. The court instructed the jury that "[t]he first conspiracy involving the defendants occurred on January 2, 1997," and that "the objective of the conspiracy was to profit through the criminal sale of more than two ounces of heroin, an 'A' felony." T. 1635. The court further instructed the jury that "[u]nder count two . . . the People allege that a second conspiracy between these two defendants lasting from January 2, 1997 . . . until July 16, 1997 ***also had as its objective*** an eventual profit from the criminal sale of more than two ounces of heroin." T. 1636 (emphasis added).

## E.  The Sentence

The jury convicted petitioner and Khan on all counts. Petitioner was sentenced to indeterminate terms of 6 to 18 years on the first conspiracy, 16 years to life on the first degree possession, and 5 years to life on the second degree possession, all three terms to run concurrently. He was sentenced to an additional, consecutive term of 5 to 15 years on the second conspiracy.[14] The imposition of consecutive terms was not inadvertent but the plain intention of the sentencing court, which remarked, "I am distinguishing the second count of conspiracy. That is the conspiracy to commit acts between January and July according to the

---

[13] Cf. United States v. Jones, 482 F.3d 60, 73 (2d Cir. 2006), cert. denied, __ U.S. __, 127 S.Ct. 1306 (2007). There, the Second Circuit rejected a duplicity and double jeopardy challenge to multiple conspiracy convictions because the jury had been "properly instructed" that "whether the government had proven that 'there existed a single, unlawful agreement, many such agreements, or no agreement at all is a question of fact' for the jury to decide."

[14] The misdemeanor charges for using drug paraphernalia and drug possession were dismissed.

evidence. They are separate and apart from what happened on January the 2nd." S. 14.[15]

Khan was sentenced to indeterminate terms of 7 to 21 years on the first conspiracy, 6 to 18 years on the second conspiracy, 18 years to life on the first degree sale, and 5 years to life on the second degree possession. Like petitioner's, Khan's sentences were imposed concurrently except for the sentence on the second conspiracy, which was made consecutive. The court again made explicit its view that the two conspiracies were distinct: "I recognize and have recognized that the two conspiracy counts are separate and distinct in that you inspired [sic] to do an act of great harm under count two." S. 19.[16]

For both petitioner and Khan, the aggregate maximum sentence on the two conspiracy counts, 33 and 37 years, respectively, exceeds the statutory maximum for a single violation of section 105.15.[17]

---

[15] Two of the sentences, but not those on the conspiracy counts, were reduced in a post-trial motion for re-sentencing pursuant to the New York Penal Law § 70.71, part of the Drug Law Reform Act signed into law in December 2004. On petitioner's motion, granted on December 15, 2005, the term on the first degree sales count was reduced from 16-to-life to 9 ½, and the five-years-to life on the second degree possession was reduced to a determinate five years.

[16] Khan, likewise, secured some relief under section 70.71, obtaining reductions of the sentences on the sale and possession counts to eleven and five years, respectively. The conspiracy sentences, however, were not disturbed.

[17] Second degree conspiracy is a B felony with a maximum penalty (at the time of petitioner's and Khan's convictions) of 25 years. N.Y. Penal Law §§105.15, 70.00. When consecutive indeterminate terms are imposed, the two minimums and two maximums are added together to arrive at an aggregate minimum and maximum. N.Y. Penal Law § 70.30 (b); Practice Commentary at 328. The relevant version of Section 70.30(e)(i) further provides that if the aggregate so calculated exceeds thirty years, the aggregate maximum "shall be deemed to be thirty years." This thirty-year cap, however, does not limit the court in the sentence it may impose but rather directs the Department of Correctional Services to calculate sentences consistent with that limitation. Donnnino, Practice Commentaries, McKinney's Cons. Laws of New York, Book 39 Penal Law Art. 70 at 330.

## PROCEDURAL CONSIDERATIONS

To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording the state the "initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Picard v Connor, 404 U.S. 270, 275 (1971) (citation omitted). Petitioners need not cite "book and verse" of the federal constitution, id. at 277 (internal citation omitted), but they must show that the state court was "alerted to the fact that [they] are asserting claims under the United States Constitution." Duncan v. Henry, 513 U.S. 364, 365-66 (1995). A state court is sufficiently alerted to the constitutional claim when petitioner can show either:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) [an] assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) [an] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Jackson v. Edwards, 404 F.3d 612, 618-19 (2d Cir. 2005) (citing Daye v. Attorney Gen., 696 F.2d 186, 194 (2d Cir.1982)).

Here, in an omnibus motion prepared by pre-trial counsel Steve Zissou on behalf of petitioner only (not Khan), petitioner argued that the First and Second Counts were "duplicitous" under N.Y Criminal Procedure Law § 200.30. Captioned "duplicitous counts prohibited," section 200.30 provides, in pertinent part, that [e]ach count of an indictment may charge one offense only." C.P.L. § 200.30, subd. 1. The practice commentaries confirm that "duplicitous" as used in the statute describes "[a] count that accuses a defendant of more than one offense." Id., Preiser, Practice Commentaries, McKinney's Cons. Laws of New York, Book 11A, Crim. Proc. Law at 283. Although the Double Jeopardy claim that petitioner makes here arguably bears some relation to the state's statutory proscription against duplicity inasmuch as his claim

questions the integrity of each count *qua* count, that is as far as the similarity goes.  The premise of his Double Jeopardy claim—the straddling of a single offense over two counts—is a defect of a distinctly different kind, and bears the label "multiplicity," rather than duplicity.  See Jones, 482 F.3d at 72 (Second Circuit explains that "[a]n indictment 'is multiplicitous when a single offense is alleged in more than one count'") (internal citations omitted).

Nonetheless, the factual content of the claim to which petitioner affixed the label "duplicity" makes clear that petitioner was complaining, in substance, of *multi*plicity.  His pre-trial motion papers argued, in pertinent part, that, "The People . . . allege that because the defendants allegedly agreed to sell additional heroin on a future date . . . a second conspiracy is thereby initiated."  People v. Haji, No. 3245/97, Mem. Dec. (Sup. Ct. Queens County, May 18, 1998) ("Omnibus Decision") at 10.  The motion further asserted that this "theory is disingenuous, as it would permit multiple counts of an indictment to be charged upon each and every promise to sell narcotics."

Rejecting the claim on the merits, the state court likewise labeled the claim duplicity but treated it as multiplicity: the dispositive determination was its finding that "each conspiracy is distinct, relating to different periods and agreements."  Omnibus Decision at 2.[18]

---

[18] Petitioner's pre-trial duplicity claim also rested on the fact that, in the original indictment, both conspiracy counts contained the same overt act, namely, the possession of narcotics records.  As discussed, that act has subsequently been stricken from the First Count, and so that particular factual premise is not a component of the Double Jeopardy claim in the petition; but the inclusion of that factual ground in the duplicity claim is further evidence that petitioner's claim, though labeled duplicity, was in substance a complaint that both counts were the same, rather than that two crimes were charged in a single count.  On this component of the claim, the trial court likewise again labeled the claim duplicity but rejected it on multiplicity-based reasoning, finding that there was "no duplicity pursuant to CPL 200.30 with respect to count one and two, charging conspiracy in the second degree, merely because the same overt act, among others, is relied upon in each count."  Omnibus Decision at 2.

Concluding that petitioner's duplicity claim was in substance a claim of multiplicity does not fully resolve whether the pre-trial assertion of that claim "fairly presented" the Double Jeopardy claim. This is because of the often misunderstood relationship between multiplicity and Double Jeopardy: charging the same crime in more than one count is not itself fatal to an indictment but, if unremedied along the course of the trial, can result in constitutional error if it leads to separate punishments on the two counts.[19]

Because Double Jeopardy is the inevitable last stop of the multiplicity train, however, petitioner arguably *did* present his claim "in terms so particular" as to have at least "call[ed] to mind" his Double Jeopardy rights. Daye, 696 F.2d at 194. Nonetheless, assuming without deciding that his pre-trial duplicity claim succeeded in "fairly presenting" his Double Jeopardy claim to the state court (and even treating the court's decision as a "determination on the merits" of the Double Jeopardy claim for purposes of section 2254(d) deference), it remains the case that, regardless of its label, the critical constitutional contention was *not* raised again, either at

---

[19] See, e.g., United States v. Ansaldi, 372 F.3d 118, 124 (2d Cir.), cert. denied 543 U.S. 949 (2004) ("[a]n indictment is multiplicitous if it charges the same crime in two counts," and "[t]he primary problem is that the jury can convict on both counts, resulting in two punishments for the same crime in violation of the Double Jeopardy Clause of the Fifth Amendment") (internal citations omitted) (citing additional authorities). See generally "Indictments," 37 Geo. L. J. Ann. Rev. Crim. Proc. 257, 280-84 (2008) (collecting cases from First, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth and Eleventh Circuits employing similar reasoning). As these authorities make plain, there exist any number of ways in which the defect of multiplicity can and should be remedied before judgment. Often a court directs the prosecution, early in a case, to elect between multiplicitous counts, see, e.g., United States v. Seda, 978 F.2d 779, 782 (2d Cir. 1992), or the court may itself dismiss or consolidate counts. See Charles Alan Wright, et al., Federal Practice and Procedure § 145, at 86-87 (3d ed. 1998). If the court allows both counts to go to the jury, it can specifically instruct the jury that, if it finds guilt on one of the counts, it need not deliberate upon the other. See, e.g., United States v. Moore, 149 F.3d 773, 779 (8th Cir.) cert. denied, 525 U.S. 1030 (1998). If, however, a jury convicts on both multiplicitous counts, the court should vacate one of the underlying convictions. Ball v. United States, 470 U.S. 856, 864-65 (1985).

the close of the evidence, during the charging conference, after the verdicts were announced, when consecutive sentences were imposed, or on direct appeal.[20]  The Double Jeopardy claim, therefore, remains unexhausted.  Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994) (claim exhausted only if presented to "the highest court of the pertinent state"), cert. denied, 514 U.S. 1054 (1995) (internal citation omitted).

Because petitioner can no longer return with the Double Jeopardy claim to the state courts, the Court deems the claim exhausted but procedurally defaulted.  See Coleman v. Thompson, 501 U.S. 722 (1991); Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001).[21] Accordingly, the Court may reach the Double Jeopardy claim only if it finds "cause" for petitioner's procedural default and "prejudice" as a result of denying habeas review of the claim, or if petitioner demonstrates that failure to consider the claim on habeas will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 748.  Petitioner blames the default on his trial and appellate lawyers; while a *successful* constitutional ineffective assistance of counsel claim can satisfy the "cause" and "prejudice" test, Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000), each such assertion of ineffectiveness is itself an independent constitutional claim that must be fully presented and exhausted in the state courts before being addressed here on the

---

[20] Although Mr. Zissou prepared the pre-trial motion on behalf of petitioner, at trial he was represented by Michael Warren, and on appeal, by the Legal Aid Society, whose brief *did* challenge the consecutive nature of the sentences, but only on the grounds of undue harshness. The Appellate Division affirmed petitioner's conviction, People v. Haji, 2 A.D. 3d 457 (2d Dep't 2003), and the Court of Appeals denied leave.  People v. Haji, 1 N.Y.3d 628 (2004).

[21] Because the Double Jeopardy claim is plainly based on material in the trial record, it would be futile for petitioner to raise it in a 440 motion to vacate in state court.  See C.P.L. §440.10 ("the court must deny" such a motion when "sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's . . . unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him").

merits as a ground for excusing procedural default.  Id.

Petitioner is in full procedural compliance on these claims, having fully presented and exhausted in the state courts his claims of ineffectiveness by trial and appellate counsel.[22]  On papers of commendable quality prepared by newly retained counsel Glenn A. Garber, the first of petitioner's lawyers to focus precisely on the Double Jeopardy issue,  petitioner moved in state court, under C.P.L. § 440.10, to vacate his conviction on the ground that trial counsel  (Mr. Warren) was ineffective for failing to adequately pursue the Double Jeopardy issue, and petitioned the Appellate Division for a writ of error *coram nobis* in which he argued that appellate counsel was likewise ineffective for failing to address the Double Jeopardy claim (and for failing to assert that trial counsel was ineffective for failing to properly assert or preserve it)

Denying the 440 motion, the trial court concluded that the Double Jeopardy Clause "is not applicable, as [petitioner] incorrectly contends, to simultaneous prosecutions for the same offense."  People v. Haji, No. 3254/97, Memorandum (May 4, 2006) ("440 Decision") at 5.  The court then explained, "[r]ather than a Double Jeopardy violation, [petitioner] is, in actuality, attempting to portray the indictment as 'multiplicitous,' contending that counts I and II charge the same crime."  Id.  Incorporating the conclusions of  the judge who decided the pretrial motion, the 440 court made a similar finding: "Having presided over the trial of this indictment, the Court finds that the conspiracies charged and proven under Counts I and II of the indictment were, despite involving similar circumstances and the same participants, separate offenses, as each required proof of additional facts that the other did not," citing Blockburger v. United

---

[22]  Respondent does not contest exhaustion, nor oppose petitioner's application to-reopen this case, following an earlier stay entered to allow him to carry through with his state court filings.

<u>States</u>, 284 U.S. 299 (1932). 440 Decision at 6. The court then determined that, "since there was not a Double Jeopardy violation, trial counsel was not 'ineffective' for failing to raise such an argument." <u>Id.</u>

The Appellate Division denied the *coram nobis* but did not address the Double Jeopardy claim, stating only that petitioner had "failed to establish that he was denied the effective assistance of appellate counsel" (citing <u>Jones v. Barnes</u>, 463 U.S. 745 (1983)). <u>People v. Haji</u>, 22 A.D.3d 599 (2d Dep't 2005). The final steps required for exhaustion were also pursued: petitioner sought leave to appeal the Appellate Division's denial of his *coram nobis* petition, which the Court of Appeals denied, <u>People v. Haji</u>, 6 N.Y.3d 776 (2006). He also sought leave to appeal the 440 Decision, which the Appellate Division denied on June 28, 2007.[23]

---

[23] Factually and legally, Khan stands in the same position as petitioner with respect to the Double Jeopardy claim; he also stands in nearly the same position procedurally, with minor differences set forth here but not material to the analysis. His conviction was unanimously affirmed, <u>People v. Khan</u>, 2 A.D.3d 461 (2d Dep't 2003), and leave to appeal to the Court of Appeals was denied. <u>People v. Khan</u>, 1 N.Y.3d 630 (2004). Neither Richard Jasper (Khan's trial counsel) nor John Gemmell (his appellate counsel) raised the Double Jeopardy claim or made any argument that could be construed as fairly calling that issue to mind. Khan raised the Double Jeopardy issue for the first time in second motion to vacate pursuant to C.P.L. §440.10, filed pro se in 2006. He also claimed in that motion that trial counsel was ineffective for failing to raise this claim. The trial court denied the motion in a decision dated the same day as its decision denying petitioner's 440 motion, May 4, 2006. Except for the caption and the sentencing particulars relating to Khan, the decision on Khan's 440 motion is identical to the 440 Decision in petitioner's case with respect to the Double Jeopardy and ineffectiveness claims.

As in petitioner's case, respondent does not dispute that Khan has exhausted his ineffectiveness claims for purposes of excusing his procedurally defaulted Double Jeopardy claim. Khan sought leave to appeal the denial of the 440 motion to the Appellate Division, which was denied. <u>People v. Khan</u>, (No. 2006-06987, 2d Dep't, Dec. 12, 2006). On May 30, 2006, Khan filed a writ of error *coram nobis* in the Appellate Division claiming that Mr. Gemmell was ineffective because he failed to raise the Double Jeopardy issue and because he failed to raise the issue of trial counsel's ineffectiveness. The Appellate Division denied Khan's application, stating only that he "has failed to establish that he was denied the effective assistance of appellate counsel." <u>People v. Khan</u>, 33 A.D.3d 722 (2d Dep't 2006). Leave to appeal the denial of the *coram nobis* to the Court of Appeals was denied. <u>People v. Khan</u>, 8

**DISCUSSION**

## A. **Double Jeopardy**

1. The Applicable Supreme Court Holdings[24]


     a. *The Protection Against Multiple Punishments for a Single Offense:*
       *North Carolina v. Pearce*

The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const., amend. V.  The guarantee against Double Jeopardy, according to the Supreme Court, "consist[s] of three separate constitutional protections," North Carolina v. Pearce, 395 U.S. 711, 717 (1969), including the "protect[ion] against multiple punishments for the same offense." Id. at 318. (internal citations omitted).  The Court in Pearce identified Ex Parte Lange, 85 U.S. 163 (1873), as "the landmark case" where "[t]he Court stated the controlling constitutional principle almost 100 years ago." Pearce, 395 U.S. at 717.  That principle is:

> If there is anything settled in the jurisprudence of England and America, it is that no man can be twice lawfully punished for the same offence.  And . . . there has never been . . . any doubt of (this rule's) entire and complete protection of the party when a *second punishment is proposed in the same court, on the same facts, for the same statutory offense*.

---

N.Y.3d 924 (2007).

    [24] See Carey v. Musladin, 549 U.S. 70, 127 S.Ct. 649, 653 (2006) (habeas relief available only if state court decision "was contrary to or involved an unreasonable application of *this* Court's applicable *holdings*") (emphasis added); Williams v Taylor, 529 U.S. 362, 412 (2000) (federal law in section 2254(d) "refers to the *holdings* . . . of *this* Court's decisions") (emphasis added); Rodriguez v. Miller, 537 F.3d 102, 109 (2d Cir. 2008) (McLaughlin, C.J.) (despite Williams, "nevertheless, in the past we (and other courts) occasionally have relied on our own precedents to interpret and flesh out Supreme Court decisions to variegated petitions as they come before us" but, in light of Musladin, "[i]t would appear that we can no longer do this").

23

> . . . (T)he Constitution was designed *as much to prevent the criminal from being twice punished* for the same offense as from being twice tried for it.

Pearce, 395 U.S. at 717 (quoting from Lange, full internal citation omitted) (emphasis added).[25]

The Supreme Court regularly cites Peace and Lange as the cases recognizing the Double Jeopardy protection against multiple punishments for the same offense. See, e.g., Rutledge v. United States, 517 U.S. 292, 297 (1996); United States v. Dixon, 509 U.S. 688, 696 (1993).

### b. The *Blockburger* Test

In Blockburger v. United States, 284 U.S. 299 (1932), Harry Blockburger was convicted under a statute creating the offense of selling forbidden drugs except in or from the original stamped package, and under another section of the same statute, which created the offense of selling any of such drugs not in pursuance of a written order of the person to whom the drug is sold. 284 U.S. at 303-304 (internal statutory citations omitted). The trial court sentenced him to consecutive terms of imprisonment. Blockburger challenged the conviction and sentence on the ground that both crimes were based on the same act, his single sale of morphine hydrochloride. The Supreme Court framed the issue before it as "whether, both sections being violated by the same act, the accused committed two offenses or only one," 284 U.S. at 304, and held that, "although both sections were violated by the one sale, two offenses were committed." Id. The Court arrived at its holding by announcing and then applying its now famous test:

---

[25] The holding of Lange is illustrative. The Supreme Court held that a sentence of one year in jail and a two-hundred dollar fine violated the defendant's Double Jeopardy rights because the statutorily authorized punishment for his crime (stealing mail bags) was either imprisonment or the fine but not both. Lange, 85 U.S. at 175-78. The Court explained that "[t]he protection against the action of the same court in inflicting punishment twice must surely be as necessary, and as clearly within the [Double Jeopardy] maxim, as protection from chances or danger of a second punishment on a second trial." Id., 85 U.S. at 169.

> Each of the offenses created requires proof of a different element. The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."

Id. (internal citations omitted).

Although neither the Double Jeopardy Clause nor the Constitution is referred to in either the Blockburger decision or in any of petitioner Harry Blockburger's briefs to the Court,[26] the Supreme Court regularly refers to the test announced in Blockburger as a measure of Double Jeopardy rights.  See, e.g., Rutledge, 517 U.S. at 297 ("For over half a century we have determined whether a defendant has been punished twice for the "same offense" by applying the rule set forth in Blockburger v. United States"); United States v. Dixon, 509 U.S. at 697 ("In both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies," citing Blockburger).

The Blockburger test is used, however, only to consider whether a particular act or course of conduct is punishable under more than one statute.  See, e.g., Albernaz v. United States, 450 U.S. 333, 345 (1981) (Court rejected Double Jeopardy challenge to consecutive sentences for conspiring to import marijuana, in violation of 21 U.S.C.§ 963, and conspiring to distribute marijuana domestically, in violation of 21 U.S.C. § 846, because each statute required an element—"importing" and "distributing,"respectively —that the other did not);  Sanabria v.

---

[26] See 1931 WL 30641 (Appellate Brief) Petitioner's Statement, Brief and Argument (Nov. 16, 1931); 1931 WL 32884 (Appellate Brief) Petitioner's Statement, Brief and Argument (Oct. Term 1931)

United States, 437 U.S. 54, 70 n. 24 (1978) (Court expressly declines to use Blockburger to assess a Double Jeopardy "multiple punishments" claim involving only a single statute).

    c. *The Allowable Unit of Prosecution*

The comparison of *statutory* elements required by Blockburger, however, embodies a principle not limited to the multiple-statute context, namely, that an "offense" for Double Jeopardy purposes is what the legislature defines it to be, as the Court made explicit in Albernaz. There, the Court agreed that the evidence established only a single conspiratorial agreement (albeit having the dual objectives of importing and distributing), but the Court reasoned that Congress's decision to create two distinct objective-specific conspiracy crimes reflected an intent to authorize cumulative punishments even for the single "act" of conspiring:

> As we previously noted . . . "[w]here consecutive sentences are imposed at a single criminal trial, the role of the [Double Jeopardy] guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." . . . Thus, the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed. Where Congress intended, as it did here, to impose multiple punishments, imposition of such sentences does not violate the Constitution.

Albernaz, 450 U.S. at 345.

In the single-statute context (where Double Jeopardy asks how many distinct commissions of a single offense occurred), the controlling measure is the "allowable unit of prosecution," United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221 (1952), which turns on the statutory text and the intent of the legislature, id., 344 U.S. at 222-225, with any "ambiguity . . . resolved in favor of lenity." Bell v. United States, 349 U.S. 81, 83 (1955). Undertaking this task in Universal C.I.T., the Court affirmed a lower court's dismissal of several

counts charging an employer with failure to pay overtime, concluding that the offense made punishable by the section of the Fair Labor Standards Act was "a course of conduct" that "cannot be turned into a multiplicity of offenses by considering each underpayment in a single week or to a single employee as a separate offense."  344 U.S. at 224.   Accord Bell, 349 U.S. at 81-83 (conviction and consecutive sentences for two counts of violating Mann Act reversed; petitioner's transport of two women in the same vehicle on the same trip gave rise to only one "allowable unit of prosecution"); Sanabria v. United States, 437 U.S. at 69-70 (attempt to charge numbers betting and horse betting as distinct counts of "conducting an illegal gambling business" in violation of 18 U.S.C. § 1955 would violate Double Jeopardy Clause because "[i]t is Congress, and not the prosecution, which establishes offenses [and the] allowable unit of prosecution"); Brown v. Ohio, 432 U.S. 161, 169 (1977) (reversing convictions of auto theft and lesser included offense of joyriding, which state court allowed because each "focused on different parts of" the 9-day joyride; the "Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitation by the simple expedient of dividing a single crime into a series of temporal or spatial units"). [27]

Especially relevant here is the Supreme Court's handling, in Braverman v. United States, 317 U.S. 49, 54 (1942), of a multiple-punishments Double Jeopardy claim involving a general conspiracy statute.[28]  Each of the seven conspiracy counts of conviction charged a distinct

---

[27] Nathaniel Brown stole a vehicle from a parking lot in East Cleveland, Ohio, and nine days later was caught driving the car in Wicliffe, Ohio, where he was convicted of joyriding. After serving thirty days in jail he returned to East Cleveland, where he was convicted of automotive theft.

[28] Both Sanabria and Brown make clear that, although the Court's much earlier decision in Braverman does not mention the Double Jeopardy Clause, Braverman is to be understood as part of the Court's Double Jeopardy jurisprudence.  Sanabria, 437 U.S. at 73-74; Brown, 432

objective, namely, the violation of a different provision of the Internal Revenue Code.[29]  The

government argued that "the several illegal objects of one continuing conspiracy" were a

sufficient basis for several distinct offenses, and that a jury could find the defendants "guilty of

as many offenses as [the single conspiracy] had illegal objects."  317 U.S. at 51.  The Supreme

Court reversed, holding that the defendants had committed only a single offense and could

receive no more than the statutory maximum penalty for a single violation of the conspiracy

statute.  Id.

    The Court explained that, "Whether the object of a single agreement is to commit one or

many crimes, it is in either case the agreement which constitutes the conspiracy which the statute

punishes."  Id. at 53.  This is because "the gist of the crime of conspiracy . . . is the agreement,"

and indeed "[t]he conspiracy *is* the crime, and that is one, however diverse its objects."  Id. at 54

(emphasis added).[30]


2.  Applying the Foregoing Principles

    *a.  2254(d)(1): The State Court Decision Was "Contrary to" and an "Unreasonable*
        *Application of" Supreme Court Law*

    First, the 440 court's decision plainly reveals that it understood, factually, that petitioner

---

U.S. at 169

    [29] All seven counts were charged under the same general conspiracy statute, the former
Title 18 U.S.C. § 88.

    [30] See also PLI, Model Penal Code § 5.03 ("If a person conspires to commit a number of
crimes, he is guilty of only one conspiracy, so long as such multiple crimes are the object of the
same agreement or continuous conspiratorial relationship").

and Khan were "contending that counts I and II charge the same crime," 440 Decision at 4. The court's determination, however, that the Double Jeopardy Clause "is not applicable . . . to simultaneous prosecutions for the same offense" and that petitioner and Khan *instead* were portraying the indictment as multiplicitous, is manifestly "contrary to . . . clearly established Federal Law" as determined by the holdings of the Supreme Court just reviewed. 28 U.S.C.§ 2254(d)(1).

Likewise, the 440 court's alternative ruling, that no Double Jeopardy violation occurred because each count of the indictment "required proof of a fact that the other did not," is a basis for habeas relief under either or both of the clauses in 2254(d)(1). As the Supreme Court's use of the <u>Blockburger</u> test in <u>Albernaz</u> (and its reasons for not using it in <u>Sanabria</u>) make clear, <u>Blockburger</u> compares statutory elements to determine how many different statutory "offenses" a defendant's single course of conduct may give rise to; that test cannot, as the state court believed, be of any assistance in determining how many times petitioner and Khan violated a single statute, and so the state court's reliance on the <u>Blockburger</u> test is necessarily "contrary to" the plain language of the <u>Blockburger</u> decision.[31] To the extent the state court's citation to <u>Blockburger</u> might be understandable in light of the decision's distinct place in Double Jeopardy jurisprudence, the court nonetheless engaged in an unreasonable application of the decision because it misunderstood the test as allowing *any factual differences* between the two *counts* to justify regarding them as distinct *offenses*. <u>See</u> <u>Williams</u>, 529 U.S. at 413 (writ appropriate "if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts").

---

[31] <u>See</u> <u>also</u> <u>United States v. Ansaldi</u>, 372 F.3d at 125 n. 3 (<u>Blockburger</u> test "inappropriate . . . [where] there is only one statute at issue, and so, nothing to compare").

In short, the state court's misapprehension of Supreme Court principles is understandable given the infrequency with which the Double Jeopardy issue arises in the context presented here, and given, too, the somewhat protean semantics of "multiplicity" and "duplicity," but these considerations do not render those principles any less clear or controlling. Nor do they lessen this Court's duty to remedy clear constitutional error. Williams, 529 U.S. at 387 ("[w]hatever 'deference' Congress had in mind . . . it surely is not a requirement that federal courts actually defer to a state-court application of the federal law that is, in the independent judgment of the federal court, in error").

Respondent fully endorses the state court's view of Blockburger, utilizing its phraseology to urge that factual allegations unique to each count establish that *each count* "requires proof of an additional fact which the other does not." But respondent is no more correct than the state court, for what Blockburger examines is whether "*each statute* requires proof of an additional fact which the other does not." 284 U.S. at 304 (emphasis added). This is not a mere matter of semantics but at the core of the constitutional error in this case: to allow the prosecution's count-drafting choices to furnish the differences that distinguish "offenses" for Double Jeopardy purposes would be to condone the prosecutorial usurping of the legislative power. Sanabria, 437 U.S. at 69 ("It is Congress and not the prosecution which establishes and defines offenses").[32]

Here, the offense that petitioner and Khan were convicted and twice sentenced for is

---

[32] See also United States v. Ansaldi, 372 F.3d at 124 (citing Braverman, Blockburger and other Supreme Court authority; holds that conviction for conspiracy to possess and distribute GBL and separate conspiracy to distribute and possess GHB, both charged under same statute in same indictment, violated Double Jeopardy Clause because "none of the facts peculiar to each count is relevant to the 'unit of prosecution' of the count. It is not the conduct that underlies the offense that matters for multiplicity analysis, but rather 'the "offense" - in the legal sense, as defined by the legislature") (internal citations omitted).

conspiracy in the second degree. Like the general conspiracy statute in <u>Braverman</u> and unlike

the objective-specific drug conspiracy statutes in <u>Albernaz</u>, section 105.15 of the New York

Penal Law proscribes a broad range of conduct. Nothing has been called to this Court's

attention, either through the briefing or its own research, that indicates an intent on the part of

New York lawmakers, comparable to that of Missouri lawmakers in <u>Missouri v. Hunter</u>, 459

U.S. 359 (1983), to create a separately punishable duplicate crime.[33] Likewise, there is nothing

to indicate that New York lawmakers intended to provide that each day of the conspiracy be a

separate criminal violation. <u>Cf.</u> <u>Brown v. Ohio</u>, 432 U.S. at 169 n. 8 (Court explained that it

"would have a different case if the Ohio Legislature had provided that joyriding is a separate

offense for each day in which a motor vehicle is operated without the owner's consent"). To the

contrary, unlike the statutory provisions at issue in <u>Universal C.I.T.</u> (FLSA duty to pay

overtime), <u>Bell</u> (Mann Act prohibition on interstate transport of women) and <u>Sanabria</u> (federal

proscription against gambling business), New York's general second-degree conspiracy statute is

not even arguably ambiguous with respect to the allowable unit of prosecution. The statute is

part of a penal scheme that also includes, as was charged in this case, separate crimes for each

---

[33] <u>Missouri v. Hunter</u> illustrates the Supreme Court's unflinching (indeed, quite extreme) deference to the legislature, in the Double Jeopardy context, as the body that defines crime and its corresponding punishment. The defendant there was convicted of first degree robbery by means of a dangerous weapon and also convicted under a separate statute that provides, in pertinent part, that any person who commits a felony under Missouri law through the use of a dangerous or deadly weapon "is *also* guilty of the crime of armed criminal action" and further provides that the punishment for armed criminal action "shall be in addition to any punishment provided by law" for the felony. 459 U.S. at 362 (internal statutory citations omitted). The Missouri Supreme Court found, and the Supreme Court agreed, that the two crimes were the "same" under the <u>Blockburger</u> test, but the Court nonetheless held that there was no Double Jeopardy violation because, in the Court's view, the clear intent of the Missouri legislature was to create a duplicate crime and punishment: "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." <u>Id.</u> at 368.

act of possession or sale that is committed in furtherance of the conspiracy. Moreover, New

York lawmakers have apparently codified, in section 70.25 of the Penal Law, their intent *not* to

authorize multiple punishments for a single crime. That section provides, in pertinent part:

> When more than one sentence of imprisonment is imposed on a person for
> two or more offenses committed through a single act or omission, or through an
> act or omission which in itself constituted one of the offenses and also was a
> material element of the other, the sentences . . . must run concurrently.

N.Y. Penal Law § 70.25 (McKinney's 2004). Cf. Whalen v. United States, 445 U.S. 684 (1980)

(Court found legislative intent *not* to authorize multiple punishments where, inter alia, the

District of Columbia code included a provision codifying the Blockburger test).[34]

### b. 2254(d)(2): The State Court Decisions Involved an Unreasonable Determination of the Facts in Light of the Evidence Presented

Independent of its misunderstanding of controlling constitutional law, the state court

made "an unreasonable determination of the facts in light of the evidence presented," within the

meaning of 28 U.S.C. § 2254(d)(2), when concluding that petitioner and Khan violated the

conspiracy statute twice rather than once. See Williams, 529 U.S. at 386 (the factual

unreasonableness clause of subsection (d)(*2*) "provides relevant context for [the Court's]

interpretation of" the "contrary to" and "unreasonable application" clauses of subsection (d)(*1*),

and "bolsters [the Court's] conviction that federal habeas courts *must make as the starting point

of their analysis* the state courts' determinations of fact, including that aspect of a 'mixed

---

[34] Because legislative intent is at the core of the Supreme Court's Double Jeopardy
jurisprudence in the multiple punishments area, the absence of any attention to the subject in the
state court decisions here is another feature of those decisions that is "contrary to" and an
"unreasonable application of" Supreme Court law.

question' that rests on a finding of fact") (emphasis added).[35]

Simply put, even viewing the record in the light most favorable to the prosecution, and affording the verdict and other findings of the state court the presumption of correctness under 28 U.S.C. §2254(e), is there sufficient evidence upon which any rational juror could have concluded, beyond a reasonable doubt, that there existed two distinct agreements, as opposed to only one, to seek to profit from the sale of heroin?  Stated another way, assuming, as petitioner and Khan concede for purposes of their Double Jeopardy claim, that there is sufficient evidence of a conspiracy having been formed *before* the January 2 sale, is there any basis upon which a rational juror could conclude that the objective of that conspiracy was limited to consummating *only* the January 2 sale, *but no other*, and that that first conspiracy therefore terminated upon consummation of the sale?  Could that rational juror possibly conclude that, when planning the January 2 sale, petitioner and Khan did not *also* contemplate the possibility of selling additional heroin to the undercover?  Not on this record.  As every material feature of the record catalogued above demonstrates, from the start of the prosecutor's opening through its summation, the only reasonable finding here is the formation of a single, ongoing conspiratorial relationship.

Prosecutors have never been required to establish the precise moment in time when the conspiracy was born, nor need the conspiratorial "agreement" depend upon the kind of meeting

---

[35] Assuming without deciding that each is a finding of fact entitled to a presumption of correctness for purposes of 28 U.S.C. §2254(e), the state decisions included here are the (i) the ruling on petitioner's pre-trial omnibus motion in which the court declared that "each conspiracy is distinct, relating to different periods and agreements;" (ii) the court's remarks at petitioner's and Khan's sentencings, that the two conspiracies are 'separate and apart" from each other; (iii) the portion of the 440 Decision in which the trial court "finds that the conspiracies charged and proven under Counts I and II of the indictment were, despite involving similar circumstances and the same participants, separate offenses;" and (iv) the verdicts of guilt on both conspiracy counts.

of the minds required for the making of valid commercial contract.  But here, the exactitude of respondent's claimed line of demarcation between the end of one conspiracy and the commencement of another compels microscopic examination of those fateful few moments in the BMW for some basis upon which to conclude that a second conspiracy was formed.  Because the undercover's testimony does not establish the sequence of events with precision, a rational juror might well infer that Khan did not offer the undercover his pager number until *after* the sale of 7,000 grams was fully consummated.  But what does the wedging of that moment in time establish?  Only that the two overt *acts* (the consummation of the sale, and the tendering of the pager number) were distinct and not overlapping, but not that the two acts were, for that reason alone, components of distinct conspiracies.  In short, there exists no basis for inferring the commencement, at that time or at any other time, of a wholly new agreement.  Respondent was asked to identify such evidence at oral argument and could not do so.

Respondent offers, at most, a colorable basis for finding that the conspiracy took a material step *forward* during the January 2 meeting, inasmuch as that meeting marks the introduction of Khan and petitioner to a new buyer, a culmination of sorts, to be sure.  But nothing in the record even remotely suggests that achieving this meeting exhausted the conspiratorial objectives, or altered the scope of the conspiratorial objective, which had been to seek just such a buyer.  Nor is there any basis for inferring that the buyer's possible interest in sales beyond the one then consummated was other than what the conspirators, when heading to the Pathmark lot that day, had been hoping for.[36]  To the contrary, the totality of the record as

---

[36] The so-called "unilateral theory of conspiracy" under New York law does not affect the reasoning here.  Under New York law, a defendant may be convicted of conspiracy even if one or more of his co-conspirators lacks the capacity for criminal responsibility.  New York Penal Law § 105.30.  See People v. Schwimmer, 47 N.Y.2d 1004 (1979) (affirming conviction for

catalogued above prohibits any such inference.

In short, what occurred here is precisely the kind of prosecutorial action that the Supreme Court found unconstitutional in Universal C.I.T., Bell, Sanabria, Brown and Braverman: the dividing up an "ongoing" or "course of conduct" offense into spatial or temporal units that do not correspond to the allowable unit of prosecution as defined by the legislature.[37]

---

conspiracy where the only two persons with whom defendant entered into agreement were the undercover and the confidential informant). To be clear: the Court's decision here does not turn on the impossibility of Khan and petitioner having communicated, for purposes of forming a second conspiratorial agreement, between the consummation of the January 2 sale and the supposed start of the second conspiracy. Assuming that Khan could have forged a new conspiratorial agreement among those seated with him in the BMW (a conspiracy that petitioner could arguably have joined later by his participation in telephone calls with the undercover), the facts do not allow for such an inference. To the contrary, the undercover testified that, *well in advance of the January 2 meeting*, he and the CI had agreed that he would express interest in future buys. T. 1192. In other words, even assuming the undercover and CI were persons with whom Khan could have entered into a new, second conspiracy, the undercover's testimony makes clear that this is not what in fact happened, for the possibility of later (post-January 2) sales was contemplated before the January 2 meeting.

[37] Mindful that habeas relief may be granted only where state court determinations are measured against Supreme Court decisions and found lacking, the Court nonetheless includes here citations to Second Circuit authority based on and consistent with the understanding of federal law expressed in today's decision. See, e.g., Willette v. Fischer, 508 F.3d 117, 121-22 (2d Cir. 2007) (affirming grant of habeas relief where defendant, who relocated only once, was convicted of multiple counts of violating S.O.R.A. change of address reporting requirement; rejects theory that allowable unit of prosecution is each day that offender fails to report address); United States v.Ansaldi, 372 F.3d at 124 (conviction of two drug conspiracies charged under same statute in same indictment barred by Double Jeopardy Clause because factual differences did not render the two counts distinct offenses); United States v. Maslin, 356 F.3d 191 (2d Cir. 2004) (prosecution for second marijuana conspiracy under same statute barred because, although not identical, it was "substantially the same" as first; differing geographic scope of two conspiracies insufficient to render them distinct); United States v. Lopez, 356 F.3d 463, 466-67 (2004) (Double Jeopardy Clause barred later drug conspiracy charge, which involved the "continued possession and distribution" of what was begun in first charged drug conspiracy; second charge deemed "just the rest of the story"; re-alignment of conspirators' roles and use of additional suppliers in second alleged conspiracy not sufficient to render that conspiracy distinct); United States v. Abbamonte, 759 F.2d 1065, 1068-70 (2d Cir. 1985), overruled on other grounds, 41 F.3d 35 (2d Cir. 1994) (defendant sufficiently showed that prior cocaine distribution conspiracy and later heroin conspiracy were "phases of" the same "overall . . . network" and "one overall business among all the key figures to deal in both heroin and cocaine"

*c. The Appropriate Remedy*

For purposes of their Double Jeopardy claim, petitioner and Khan appropriately do not seek retrial on a new indictment charging only a single conspiracy, but instead ask only that one of their conspiracy convictions be vacated and that they be re-sentenced accordingly. See Ohio v. Johnson, 467 U.S 493, 499-500 (1984).[38] But see Ball v. United States, 470 U.S. 856, 861(1985) ("For purposes of applying the Blockburger test in this setting as a means of ascertaining congressional intent, "punishment" must be the equivalent of a criminal conviction and not simply the imposition of sentence. Congress could not have intended to allow two convictions for the same conduct, even if sentenced under only one; Congress does not create criminal offenses having no sentencing component").[39] Both Ohio and Ball are fairly read as requiring

---

to shift burden to government to show, for Double Jeopardy purposes, that they were separate).

[38] In Ohio v. Brown, upon the defendant's plea to manslaughter and theft, the trial court dismissed, over the state's objection, the more serious counts of murder and aggravated robbery. Finding that Double Jeopardy did not bar the state from going to trial on the two more serious counts, the Court made clear that the Double Jeopardy protection against multiple punishments does not prevent the state from seeking and obtaining multiplicitous convictions. The Court explained: "The trial court's dismissal of these more serious charges did more than simply prevent the imposition of cumulative punishments; it halted completely the proceedings . . . Presumably the trial court, in the event of a guilty verdict on the more serious offenses, will have to confront the question of cumulative punishments as a matter of state law, but because of that court's ruling preventing even the trial of the more serious offenses, that stage of the prosecution was never reached. While the Double Jeopardy Clause may protect a defendant against cumulative punishments for convictions on the same offense, the Clause does not prohibit the State from prosecuting respondent for such multiple offenses in a single prosecution." 467 U.S. at 499-500.

[39] Indeed, once the Court in Ball "concluded that Congress did not intend petitioner's conduct to be punishable under both" statutes at issue there, the Court held that "the only remedy consistent with the congressional intent is for the District Court, where the sentencing responsibility resides, to exercise its discretion to vacate one of the underlying convictions. The remedy of ordering one of the sentences to be served concurrently with the other cannot be squared with Congress' intention. One of the convictions, as well as its concurrent sentence, is unauthorized punishment for a separate offense. The second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the

that, as to both petitioner and Khan, only one of the conspiracy convictions may stand.  The choice as to which is a matter for the state court, provided that any subsequent entry of judgment and re-sentencing be carried out in accordance with this Memorandum and Order.

## B.  Ineffectiveness of Trial and Appellate Counsel

Because the evidence establishes so overwhelmingly the existence of only a single conspiracy, there can be no sound strategic reason for petitioner's or Khan's trial counsel to have stood by, without objecting, while their clients suffered the harm of two convictions and consecutive terms of incarceration for a single violation of New York's second-degree conspiracy statute.  See Strickland v. Washington, 466 U.S. 668, 689 (1984);  Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir.1998) ("[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy.").

Likewise, because the bases for making a Double Jeopardy claim were fully manifest on the trial record, it cannot have been the product of "reasonable professional judgments," Jones v. Barnes, 463 U.S. 745, 755 (1983), for petitioner's or Khan's appellate counsel to have failed to address this obvious and material issue, particularly given that, in petitioner's case, appellate counsel did choose to address the consecutive nature of the sentences on other grounds, and in Khan's case, counsel likewise challenged the sentence as excessive.  Further, the failure of trial counsel to preserve the Double Jeopardy issue does not justify appellate counsel's failure to do

---

sentence. The separate conviction, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored."  470 U.S. at 864-65.

so: first, it does not appear that this was, in fact, appellate counsel's reason,[40] and second, the Appellate Division's review powers, which extend to "any question of law or issue of fact involving an error or defect which may have adversely affected appellant," N.Y. Criminal Procedure Law § 470.15 (1), include the authority to address even un-preserved issues in the interests of justice. C.P.L. § 470.15(3).

The resulting prejudice to petitioner and Khan is obvious: consecutive terms of incarceration that a properly interposed Double Jeopardy objection could and should have spared them. Accordingly, the state court decisions denying petitioner's trial and appellate ineffectiveness claims are an unreasonable application of the constitutional test set forth in Strickland.

## C. Petitioner's Other Claim

Petitioner also claims that his trial counsel was ineffective for failing to advise him of his option to testify with respect to the first conspiracy, but not the second, and for failing to seek to sever the counts to enable him to so testify. These assertions are entirely lacking in merit. The notion that the two counts might be sufficiently different so as to make severance of the counts appropriate is utterly irreconcilable with the view of the record and charges reflected in this Memorandum and Order.

---

[40] In Khan's case, appellate counsel declared, in opposition to the *coram nobis* application, that the reason he elected not to raise the issue was because, in his opinion, the two conspiracies were legitimately defined and charged as separate crimes. See Affidavit of John Gemmell in Response to Khan's Coram Nobis Application, dated June 30, 2006 at ¶15. In petitioner's case, as respondent confirmed for the Court, no opposition was even filed.

**CONCLUSION**

For all of the foregoing reasons, the application of Abidali Haji, petitioner in this case, and the application of Rashid Khan, petitioner in 06-CV-2717, for writs of habeas corpus pursuant to 28 U.S.C. §2254 are granted.   As to both Haji and Khan, the judgments of conviction entered on the two conspiracy counts are hereby vacated and the matter is remanded to the state court for proceedings consistent with this Memorandum and Order.  The Clerk of the Court is directed to close this case.


SO ORDERED.

Dated: Brooklyn, New York
       October 24, 2008

                                        s/ Judge Raymond J. Dearie
                                        _____
                                        RAYMOND J. DEARIE
                                        Chief United States District Judge